IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| KENNETH SANDERS, | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | |
| | * | Civil No. 22-1945-BAH |
| HARTFORD LIFE AND ACCIDENT | | |
| INSURANCE COMPANY, | * | |
| | | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Kenneth Sanders ("Plaintiff") brought suit against Hartford Life and Accident Insurance Company ("Defendant") alleging wrongful termination of long-term disability ("LTD") benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* ECF 1.  Pending before the Court are the parties' cross motions for summary judgment.  ECF 20; ECF 26.  Both parties filed oppositions and replies.  ECF 29; ECF 32.  All filings include memoranda of law and exhibits.[1]  The Court has reviewed all relevant filings and finds that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the reasons stated below, Defendant's motion for summary judgment is **GRANTED**, and Plaintiff's motion for summary judgment is **DENIED**.

## I.   BACKGROUND

Until January 2008, Plaintiff worked at EMC Corporation as a "Customer Service Engineer."   ECF 1, at 2 ¶ 12; ECF 26-1, at 8 (acknowledging Plaintiff's employment as

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.  The parties have also filed a joint record.  ECF 23.

undisputed).  While Plaintiff worked at EMC Corporation, he obtained an LTD insurance policy through his employer, with coverage beginning January 1, 2006.  ECF 23-1, at 1–3.  This policy was administered by Defendant.  *Id.*

The policy provided for LTD benefits of up to two thirds of the insured's salary[2] for an initial 24-month period if the plan participant was affected by "mental or physical impairment to such a degree of severity" that they were "continuously unable to perform the Material and Substantial Duties of [their] Regular Occupation" and were not otherwise gainfully employed (the "regular occupation" standard).  ECF 23-1, at 3–6.  After that initial period, the plan participant could continue to receive LTD benefits until retirement age if they were "continuously unable to engage in *any* occupation" for which they were qualified and were not otherwise gainfully employed (the "any occupation" standard).  *Id.* (emphasis added).  The policy went on to specify that if the plan participant was able to earn over 80% of their monthly earnings through working, they would not be considered disabled under the policy.  *Id.* at 7.

Under the policy, Defendant was permitted to require a participant receiving benefits to submit continuing proof of disability and was allowed to order external evaluations of a participant receiving benefits.  ECF 23-1, at 17.  The policy further provided that Defendant had "sole discretionary authority" to "determine [a participant's] eligibility for benefits and to interpret the terms and provisions of the plan."  *Id.* at 23–24.

In January 2008, Plaintiff stopped actively working with EMC Corporation due to a torn rotator cuff.  ECF 23-2, at 81–84; ECF 23-3, at 122.  He was approved for LTD benefits effective April 7, 2008, after Defendant found that Plaintiff was unable to perform the "material and

---

[2] The policy provided that the monthly award would be reduced by the amount of income received through other sources, such as social security disability benefits or other external retirement benefits.  ECF 23-1, at 9.

substantial duties" of his job at EMC Corporation.   ECF 23-2, at 82–84.   Two years later, Defendant determined that Plaintiff would no longer be eligible for LTD benefits beginning on April 7, 2010, because he was not "continuously unable to engage in *any* occupation," as required for continuing benefits beyond the initial 24 months.   *Id.* at 57–59 (emphasis added).   In March 2010, Plaintiff was diagnosed with PTSD, and in June 2010, Defendant determined that Plaintiff was, in fact, disabled under the "any occupation" standard and eligible for continuing LTD benefits effective April 7, 2010.   *Id.* at 44.   Plaintiff continued to receive LTD benefits until June 2021.   ECF 23-2, at 108.   Additionally, the Social Security Administration ("SSA") approved Plaintiff for social security disability benefits beginning September 1, 2020, ECF 23-3, at 76, and Plaintiff was approved for disability benefits through the Veterans Affairs Administration (the "VA") with a disability rating of 100% on April 20, 2020, ECF 23-6, at 291–294.

From 2010 until 2016, Plaintiff submitted regular records to Defendant of his disability and continued to receive LTD benefits.   *See* ECF 23-2, at 3–51.   In 2016, Defendant terminated Plaintiff's LTD benefits based upon medical data that showed that Plaintiff's physical and mental impairments were not serious enough to qualify him as disabled under the "any occupation" standard.   ECF 23-2, at 227.   Plaintiff appealed, and Defendant ordered additional medical evaluations of Plaintiff from consulting physicians.   ECF 23-3, at 90–91.   While the examinations relating to Plaintiff's physical conditions confirmed that those conditions were no longer disabling, the examinations relating to Plaintiff's mental health indicated that his PTSD and major depression rendered him disabled under the "any occupation" standard.   *Id.*   As a result, Defendant reversed its decision and reinstated Plaintiff's LTD benefits.   ECF 23-2, at 218.

Plaintiff continued to submit medical records documenting his disabilities at Defendant's request throughout the coming years.   ECF 23-2, at 199–217.   Plaintiff's treating physicians

described his PTSD and depression as well as Plaintiff's sarcoidosis[3] and chronic pain.  ECF 23-8, at 134–47.  Based on these disabilities, Plaintiff's functional limitations were determined to be "[n]ever bend, kneel, crouch, climb, balance, finger, or handle" and only "occasionally" lift less than five pounds.  ECF 23-7, at 382.

In 2020, Defendants again requested medical documentation from Plaintiff and attempted to reach him to discuss his claim, but Plaintiff did not respond.  ECF 23-2, at 145, 170.  Defendant's "Special Investigations Unit" ("SIU") then began a "surveillance investigation" of Plaintiff.  ECF 23-8, at 56–61.  During this investigation, the SIU observed Plaintiff working out at a gym, including lifting weights.  *Id.*  In November 2020, after the SIU had recorded Plaintiff at the gym, an investigator from Defendant called Plaintiff and asked him about his disability and related restrictions.  *Id.*  During this call, Plaintiff asserted that he had not been to the gym at all since 2019 and claimed that he only ever worked out with resistance bands and could not do any weightlifting.  *Id.*

In March 20201, Defendant contacted Plaintiff's treating physicians and sent them copies of the surveillance video of Plaintiff at the gym to elicit their analysis on how this development impacted their view of Plaintiff's restrictions. ECF 23-14, at 71–75.  Specifically, Defendant sent the video footage to Dr. Gawin Flynn, Plaintiff's cariologist and primary care doctor, Dr. Edwin Hoeper, Plaintiff's psychiatrist, and Dr. Rahul Kholsa, Plaintiff's pulmonologist.  *Id.*  Dr. Flynn responded that his analysis of Plaintiff's capacity had not changed, and that he still believed Plaintiff was not capable of working on a full-time basis.  ECF 23-7, at 393–94.  Dr. Hoeper

---

[3] "Sarcoidosis is a condition in which groups of cells in [the] immune system form small, red, and swollen (inflamed) lumps. . . .  [T]hey most commonly affect the lungs and lymph nodes in the chest.  Over time, sarcoidosis can cause permanent scarring of organs." *Sarcoidosis*, MedlinePlus, https://medlineplus.gov/sarcoidosis.html (last visited Aug. 13, 2024).

responded similarly. ECF 23-7, at 277–78. Dr. Kholsa responded by informing Defendant that Plaintiff had not authorized him to release Plaintiff's medical records. ECF 23-14, at 74.

Believing that the evidence it compiled did not support Plaintiff's claimed limitations, Defendant required Plaintiff to complete an "independent medical examination" to assess his disability and functionality. ECF 23-3, at 60–61. The examination was initially scheduled for April 19, 2021, but Plaintiff did not attend. ECF 23-2, at 136–29. Plaintiff attended a rescheduled examination on May 4, 2021, with Dr. Ifeanyi Nwaneshiudu, a specialist in Occupational Medicine. ECF 23-7, at 339–51. Dr. Nwaneshiudu reviewed Plaintiff's records and the surveillance video before the examination. *Id.* Dr. Nwaneshiudu made a number of findings based on the exam and concurrent document review, including that Plaintiff's "gait was normal," that he was able to breath without wheezing, and that "his affect and mood were normal." *Id.* at 348. He also noted that, during the exam, Plaintiff explained that "it is therapeutic for his mental health to go to the gym, and he goes frequently." *Id.* at 349. Dr. Nwaneshiudu determined that "there is no need for medically necessary work activity restrictions from a physical perspective." *Id.* at 350. Thus, Dr. Nwaneshiudu concluded, "there is no restriction or limitation in the number of hours per day and days per week [Plaintiff] is capable of working." *Id.* Dr. Nwaneshiudu, however, "defer[red] to the appropriate psychiatric specialist for any opinions and recommendations regarding impairments." *Id.*

Defendant also contracted a psychiatrist, Dr. Brandon Erdos, to "assist in determining whether [Plaintiff] is functionally impaired or requires and necessary restrictions and/or limitation associated with psychiatric conditions." *Id.* at 312. In doing so, Dr. Erdos reviewed "all available documentation." *Id.* at 311-16. Dr. Hoeper, Plaintiff's primary treating provider, explained that Plaintiff was "under good control" but that he was still totally disabled due to PTSD and

depression.  *Id.* at 310.  But after reviewing Plaintiff's treatment records, Dr. Erdos concluded that Plaintiff was not sufficiently mentally disabled to "limit work activities" because Plaintiff was only attending psychiatric appointments every one to three months over the past several years, his recent mental status examinations were within normal limits, and overall, his medication appeared to be keeping him stable.  *Id.* at 314.

After receiving the reports from Drs. Nwaneshiudu and Erdos, Defendant undertook to determine whether there was any occupation which Plaintiff could perform and earn 80% of his pre-disability salary.  *See* ECF 23-1, at 9.  One of Defendant's rehabilitation case managers prepared an "Employability Analysis Report" ("EAR") that identified several occupations she believed Plaintiff could perform that would meet this earnings threshold.  ECF 23-7, at 280–303. As a result, Defendant terminated Plaintiff's LTD benefits effective June 16, 2021.  ECF 23-2, at 108–117.

Plaintiff appealed Defendant's decision.  ECF 23-6, at 122–143; ECF 23-2, at 105.  As part of his appeal, Plaintiff submitted a separate EAR prepared by his own expert which determined that Plaintiff was unable to work in any capacity and noted that Plaintiff's "skills are long outdated and no longer transferable or marketable."  ECF 23-7, at 241–47.

In response to Plaintiff's appeal, Defendant consulted with three additional "independent specialists": Dr. Sarah Sicher, a psychiatrist, Dr. Kevin Kohan, a specialist in rehabilitation and pain medicine, and Dr. Matthew Chan, a specialist in occupational medicine.  ECF 23-6, at 43–59. These specialists each reviewed Plaintiff's files and records but did not interview Plaintiff.  *Id.* Each doctor again determined that Plaintiff had no substantial limitations related to any of his medical conditions.  *Id.*  Plaintiff disputed these reports and determinations, but Defendant upheld its decision to terminate his LTD benefits, finding that, regardless of his previous disabled status,

he was not currently disabled under the policy.  ECF 23-2, at 89–95.  Plaintiff then filed this lawsuit challenging Defendant's determination.  Both parties now claim that they are entitled to summary judgment.  ECF 20; ECF 26.

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists."  *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 603 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing

*Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)).  For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion."  *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

Because this case presents a challenge to an ERISA plan administrator's decision, the Court must determine what level of deference to afford the underlying determination of benefits.  The parties dispute what level of deference is appropriate.  Plaintiff contends that the Court should conduct a *de novo* review, ECF 20, at 7–8, while Defendant asserts that a more deferential abuse of discretion standard should apply, ECF 26-1, at 24–26.

The seminal case on this question is *Firestone Tire and Rubber Co. v. Bruch* ("*Firestone Tire*"), wherein the Supreme Court held that that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  489 U.S. 101, 115 (1989).  When the administrator is given discretionary authority with respect to benefits eligibility, though, the plan is reviewed under an abuse of

discretion standard.  *Id.*  It is undisputed that the policy at issue in this case contains a term which "delegate[s] sole discretionary authority to [Defendant] to determine [Plaintiff's] eligibility for and entitlement to benefits under the Plan."  ECF 23-1, at 24.

In response to the holding of *Firestone Tire*, the Maryland General Assembly passed a law in 2011 that prohibits the sale of any disability insurance policy that "contains a clause that purports to reserve sole discretion to the carrier to interpret the terms of the policy."[4]  Md. Code Ann., Ins. § 12–211(b).  According to Plaintiff, the passage of this law renders unenforceable the provision of Defendant's plan which provides sole discretion to Defendant to determine eligibility and entitlement to benefits.  ECF 20, at 3.  Defendant disputes this, highlighting that § 12–211 was enacted in 2011, but that the policy in question was effective as of 2008.  ECF 26-1, at 26.

When § 12–211 was passed, the legislature specified that it would "apply to disability insurance policies sold, delivered, issued for delivery, or renewed in the State on or after October 1, 2011."  2011 Md. Laws 155, Sec. 2.  Plaintiff does not dispute that the policy here was issued prior to 2011, and there is no assertion that it was renewed after its initial issuance.  *See* ECF 29, at 2–3 (failing to dispute Defendant's assertion that the policy was issued in 2008 or allege any subsequent renewal).  As such, the discretion provision of Defendant's policy enforceable, and the Court will review Defendant's decision for abuse of discretion.  *Arrington v. Sun Life Assurance Co. of Canada*, Civ. No. TDC-18-0563, 2019 WL 2571160, at *6 (D. Md. June 21, 2019) (finding enforceable a contract clause granting the defendant sole discretion in determining benefits eligibility "because the Policy was sold [] in 2007, before section 12–211 was enacted, and because

---

[4] Both parties agree that the laws of Maryland govern the policy at issue here.  *See* ECF 20, at 7–8 (applying Maryland law); ECF 26, at 24–26 (applying Maryland law.

it was not renewed, delivered, or issued for delivery after October 1, 2011" and reviewing under abuse of discretion standard).

Under the abuse of discretion standard, the Court "should affirm a discretionary decision of a plan administrator if it is the result of a 'deliberate, principled reasoning process' and is supported by 'substantial evidence,' even if [the Court] would reach a different decision independently." *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013) (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010)). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) ("[Substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").

In considering whether the plan administrator's decision was reasonable under the abuse of discretion standard, courts in the Fourth Circuit consider the non-exhaustive factors enumerated in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d 335, 342–43 (4th Cir. 2000). "All eight *Booth* factors need not be . . . in play" in every case. *Helton*, 709 F.3d at 357.

The so-called "conflict of interest" factor is worth particular attention at this point. The Supreme Court has held that when a plan administrator "both determines whether an employee is

eligible for benefits and pays benefits out of its own pocket," as is the case here, "that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citation omitted).  The Fourth Circuit has held that, in such a situation, it is appropriate to "adjust the standard of review by decreasing [the Court's] deference to [the plan administrator] in proportion to the degree of [the administrator's] conflict of interest." *Hensley v. Int'l Bus. Machines Corp.*, 123 F. App'x 534, 537 (4th Cir. 2004).  "In such circumstances, [the Court] must determine whether the denial of benefits would constitute an abuse of discretion by a *disinterested* fiduciary." *Id.* (citation omitted) (emphasis in original). Because Defendant here is both insurer and administrator, the Court will apply this modified standard.

## III.   ANALYSIS

Plaintiff asserts that he is entitled to summary judgment because Defendant abused its discretion in determining that he was not disabled under the terms of the plan, specifically by relying on flawed medical reviews which disregarded Plaintiff's subjective accounts of pain and improperly relied upon surveillance video of Plaintiff.  ECF 20, at 8–28.  Defendant counters that it is Defendant who is entitled to summary judgment because its decision was reasonable and not an abuse of discretion.  ECF 26-1, at 26–34

### A.   The physician reports on which Defendant relied were reasonable.

Plaintiff argues that Defendant's decision was unreasonable because it was based on flawed physician reviews which improperly ignored Plaintiff's subjective accounts of pain and improperly relied on the surveillance video of Plaintiff at the gym.  The Court will evaluate each of these arguments in turn.

1.     *The reviewing physicians appropriately considered Plaintiff's subjective complaints of pain.*

First, Plaintiff argues that Defendant's "independent" experts erred in ignoring Plaintiff's subjective complaints of pain and fatigue and in "demand[ing] objective evidence of inherently subjective symptoms." ECF 20, at 16–22. The Court agrees with Plaintiff's broad point that a policy administrator is not free to entirely discount reports of subjective pain merely because they are subjective reports. *See* ECF 20, at 16–18; *see also DuPerry v. Life Ins. Co. of N. Am.*, Civ. No. 08-344, 2009 WL 10681746, at *10 (E.D.N.C. Aug. 10, 2009), *aff'd*, 632 F.3d 860 (4th Cir. 2011) (explaining that a plan administrator may not "simply dismiss such subjective complaints of pain out of hand, especially where there is objective medical proof of a disease that could cause such pain"). But while an administrator cannot ignore subjective reports of pain "out of hand," they can assess the weight of those reports against conflicting evidence. *Id.* ("[A] plan administrator employing a principled reasoning process need not simply accept a claimant's subjective complaints of pain without question, especially if there is other conflicting evidence in the record. . . . Rather, such a plan administrator must have substantial conflicting evidence regarding the claimant's subjective complaints of pain." (citation omitted)).

Plaintiff is correct that the physician reviewers ultimately found that Plaintiff's subjective reports of pain were not entitled to the level of deference Plaintiff would prefer. This does not, however, mean that the doctors discounted "out of hand" his reports of pain. Indeed, the doctors did consider his reports of pain. Dr. Nwaneshiudu found that Plaintiff had "chronic joint pain symptoms" but that his resultant limited range of motion was "was much improved on distraction." ECF 23-2, at 113. Despite Plaintiff's reports of pain, Dr. Nwaneshiudu found that the data as a whole, including both the video of Plaintiff lifting weights at the gym and Plaintiff's self-reports that he frequently exercised at the gym, as well as the improvement in his mobility when he was

"distracted," did not support functional limitations on his ability to work.   *Id.*  Thus, Dr. Nwaneshiudu did not discount Plaintiff's reports of pain "out of hand"—rather, he weighed those reports of pain against conflicting information and determined that Plaintiff's condition did not merit functional limitations.

Dr. Kohan came to a similar conclusion in reviewing Plaintiff's file.   While he acknowledged Plaintiff's diagnoses and reports of pain, he found the credibility of those reports to be diminished due to inconsistencies between the pain and movement capacity Plaintiff reported and what he displayed when he was not aware he was being observed.   ECF 23-2, at 91 (observing a "history of pulmonary sarcoidosis, shortness of breath, fatigue, and chronic pain syndrome" and that Plaintiff reported "chronic joint pain and chronic fatigue" but noting that the surveillance video "show[ed] [Plaintiff] very functional, at a level that is almost in direct contradiction to functions suggested in medical reports"); *see also Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 992 (E.D. Va. 2005) ("[I]t is appropriate for a plan administrator to accord substantial weight to the absence of objective evidence of a disability claim, especially if a claimant's subjective pain complaints are suspect or unreliable.").   Having thus assessed plaintiff's subjective complaints, Dr. Kohan determined that the rest of the data in Plaintiff's file did not support a finding that he was functionally limited.   ECF 23-2, at 91.   Dr. Chan's analysis followed a similar path, finding Plaintiff's self-reports of pain to be of lessened credibility given the inconsistencies and finding no other reason to place limitations on his physical capacity for work. *See* ECF 23-2, at 91–92 (again noting Plaintiff's reports of pain and the inconsistencies between those reports and other objective evidence, such as the surveillance tape).

Nor did the reviewers require objective evidence of subjective symptoms. As discussed above, they considered the subjective evidence but found that all of the data, when viewed

holistically, did not support the limitations Plaintiff had previously been prescribed.  Because the doctors did not err in their evaluation of the subjective evidence, Defendant did not err in relying on the doctors' reports.  *See Wertheim v. Hartford Life Ins. Co.*, 268 F. Supp. 2d 643, 662 (E.D. Va. 2003) ("[I]t is well-settled that a plan fiduciary does not abuse its discretion . . . by denying benefits when choosing between conflicting medical reports in the record").

        2.    *The reviewing physicians appropriately considered the surveillance video.*

Plaintiff next argues that the medical reviewers erred in relying on the surveillance video of Plaintiff.  ECF 20, at 24–27.  In support, Plaintiff argues that "[c]ourts have taken a dim view of the use of a one-time surveillance video as the basis for finding an individual not disabled" and cites to *Morgan v. UNUM Life Insurance Company of America*, 346 F.3d 1173 (8th Cir. 2003). ECF 20, at 25.  In *Morgan*, the plaintiff was disabled due to chronic pain from fibromyalgia, among other things.  *See* 346 F.3d at 1175–76.  The defendant insurer conducted an investigation of the plaintiff during which it obtained video footage of him driving his car, getting lunch, and going to the gym.  *Id.* at 1176.  Based on this video, the insurer's physician decided that the plaintiff's "activities were incompatible with fibromyalgic impairment" and the defendant terminated the plaintiff's benefits.  *Id.* While a high-level summary of *Morgan* bears facial similarities to the case before the Court today, additional facts reveal significant differences.

In *Morgan*, the defendant insurer "already knew through its [initial] investigation of Morgan's application for benefits that he routinely engaged in the type of activities that UNUM later observed through surveillance."  346 F.3d at 1177–78. As a result, the surveillance was "nothing new" and could not have logically changed the initial determination the defendant had made that the plaintiff was disabled.  *Id.* at 1178.  Such is not the case here, where Plaintiff told Defendant that he did not attend the gym and could not at all lift heavy objects.  ECF 23-14, at 38 ("I can't actually lift those up, THOSE weights. And so I don't try due to the fact that it causes,

you know, it, it causes problems." (capitalization in original)). Here, there is new information revealed by the surveillance that paints a different picture from Defendant's previous understanding of Plaintiff's disability.

And while Plaintiff next argues that courts have found video evidence specious when the evidence does not show the subject engaging in sustained, continuous physical activity, *see* ECF 20, at 26, that is not the extent of what Defendant has done here. The doctors need not look at the surveillance video of Plaintiff and determine that he could lift the amount of weights he lifts at the gym all day long in order to adjust his disability status; they only need to see that video and realize that Plaintiff had greater physical capacity than he had reported in order for them to reassess the value they assign to each piece of evidence. *See Larson v. Old Dominion Freight Line, Inc.*, 277 F. App'x 318, 322 (4th Cir. 2008) ("Not only does this video demonstrate that Larson can engage in physical activity far more strenuous than sedentary employment, but it also directly contradicts Larson's sworn affidavit submitted with his first appeal. This calls into question the credibility of Larson's self-reports of pain."). Therefore, Defendant properly considered the surveillance video as one piece of evidence in a holistic assessment of Plaintiff's case.

### B. Defendant did not err in failing to defer to the SSA.

Plaintiff claims that Defendant erred in failing to afford substantial weight to the decision of the SSA to award Plaintiff social security benefits. ECF 20, at 14–15. And while Plaintiff is correct that courts have, at times, found SSA decisions to be instructive in LTD decisions, the plan administrators are not bound by SSA decisions. *Willis v. Baxter Int'l, Inc.*, 175 F. Supp. 2d 819, 825 (W.D.N.C. 2001). The deference owed to SSA determinations is diminished further when the information on which the plan administrator bases their decision was not available to the SSA when it made its decision. *See Realmuto v. Life Ins. Co. of N. Am.*, Civ. No. GLR-14-1386, 2015 WL 4528182, at *5 (D. Md. July 24, 2015). Here, as in *Realmuto*, "the surveillance video and

independent physicians' opinions [on which Defendant based its determination] were not available or considered by SSA in determining [Plaintiff's] eligibility for benefits. Thus, the Court finds no reason to weigh SSA's disability determination any more favorably than the other evidence before it." *Id.* Defendant did not err in failing to defer to the SSA's determination.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the *Booth* factors suggest that Defendants' decision is not an abuse of discretion and should not be overturned by the Court. As such, Plaintiff's motion for summary judgment, ECF 20, is DENIED, and Defendant's cross motion for summary judgment, ECF 26, is GRANTED.

A separate implementing Order will issue.


Dated: <u>August 26, 2024</u>                                    <u>              /s/              </u>
                                                         Brendan A. Hurson
                                                         United States District Judge

16